IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| FORD MOTOR COMPANY, a Delaware corporation, JAGUAR CARS, LTD., a United Kingdom Company, ASTON MARTIN LAGONDA, LTD.,a United Kingdom Company, VOLVO HOLDING AB, a corporation organized under the laws of Sweden,<br><br>Plaintiffs<br><br>vs.<br><br>GREATDOMAINS.COM, INC. et.al.<br><br>Defendants. | Civil No. 00-71544<br><br>REPLY IN SUPPORT OF DIAMOND STAR MARKETING, INC.'S RULE 12(b) MOTION TO DISMISS; and REQUEST FOR ATTORNEY'S FEES; and REQUEST FOR EXTENSION OF TIME TO FILE REPLY<br><br>(Assigned to the Honorable Gerald Rosen) |

Defendant, Diamond Star Marketing, Inc. ("DSM"), through counsel undersigned, hereby offers this Reply in Support of his prior Motion to Dismiss for lack of personal jurisdiction over DSM, and his Request for Attorney's Fees. This Reply is supported by DSM's Motion to Dismiss, dated July 14, 2000, the pleadings on file, and the attached Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED this 29th day of September, 2000.

ROBERT R. YODER, P.C.

By: _____
Robert R. Yoder
5080 North 40th Street, # 335
Phoenix, Arizona 85018
Attorney for Defendants

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

On July 14, 2000, DSM submitted its Motion to Dismiss, on the grounds that this Court lacks personal jurisdiction over DSM. All of the allegations raised by Plaintiffs, Ford Motor Company, Jaguar Cars, LTD., Aston Martin Lagonda, and Volvo Holdings, AB, (collectively referred to as "Ford"), center around DSM's advertisement of a domain name (stangstuff.com) for sale on the Internet. In this litigation, Ford has sued approximately 100 separate defendants scattered throughout the country, suing each of them in Michigan in light of the fact that people in Michigan (as in every other state or city throughout the country and world) can log onto the Internet and could have found the challenged domain names for sale.

DSM asserts that this court lacks jurisdiction over it. It also believes that its good faith registration of stangstuff.com, in any event, does not violate any law whatsoever.[1] However, as DSM lacks the financial resources to engage in protracted litigation with Ford in a forum which is 2,000 miles away from its only location, Scottsdale, Arizona, DSM entered into what it thought was an agreement with Ford whereby Ford would file a Notice of Pending Settlement and Stipulation to Continue DSM's Reply date in the event settlement negotiations break down.[2] Since then, however, DSM has not received a copy of any Notice of Pending Settlement, and DSM has not received a copy of any Stipulation to extend its Reply deadline. Accordingly, DSM hereby submits this Reply and requests the Court to accept it as timely in light of DSM's reasonable expectation that Ford would have already filed said Notice or Stipulations.

---

[1] Unlike most of the domain names under challenge, stangstuff.com does not incorporate an actual Ford trade name. Instead, Ford argues that DSM should be treated the same as those defendants that registered actual trade names because "stang" is a slang term used by classic car enthusiasts to refer to certain "classic" Mustangs.

[2] Attached hereto as Exhibit A is a letter from defense counsel confirming said agreement.

## II. DISCUSSION.

DSM's Motion to Dismiss points out that DSM has engaged in no activities which would invoke personal jurisdiction under Michigan's long arm statute, and further points out that DSM has conducted no activities in the state of Michigan which would purposely avail itself of this Court's jurisdiction. DSM also points out the extreme injustice in forcing small defendants with small claims and limited resources to defend cases in a foreign jurisdiction against a multi-national corporation --- merely because the Internet can be accessed in jurisdictions which are convenient to the multi-national corporate plaintiff. In fact, striking against all notions of justice and fair play, Ford is well aware that a small individual defendant, no matter how strong its rights, cannot possibly afford to defend such litigation over a domain name that has value in all likelihood which is less than the cost of preparing an answer to a civil action or the cost to fly across the country for even a single hearing. It is undisputed that the Anti-Cybersquatting Act is a well intentioned statute designed to protect otherwise helpless trademark holders from being forced (for fear of costly litigation) to buy back their own names from bad faith cyberpirates. This litigation, however, has nothing to do with such activities. To the contrary, this litigation represents Ford's attempt to force DSM (for fear of costly litigation) to turn over a name which was registered in good faith.[3]

While Ford cites to broad propositions for jurisdiction in the realm of Internet claims wherever a potential plaintiff may have access to the Internet, the cases Ford cites for that proposition are to the contrary. Panavision v. Toeppen, 141 F.3d 116 (9th Cir. 1998), cited to by Ford is an obvious example of Ford's overstatement. In that case, the defendant specifically geared its sale of a domain name at an entertainment industry which the court found to be uniquely focused in Hollywood, California, through intentional and willful tortious conduct, including the registration of domain names which expressly incorporated the exact trademark of

---

[3] Even worse, Ford continues to pursue this matter even though DSM has unconditionally offered to give Ford the name in question.

3

Hollywood's famous Panavision company, and by attempting to extort Panavision with astronomical financial demands through letters directed specifically at Panavision in California itself. Ford (a Delaware corporation with manufacturers and dealers throughout the world) has not alleged any similar facts against DSM. Specifically, Ford has not (and cannot) allege that DSM incorporated an exact trade name of Ford. Ford has not (and cannot) allege that DSM attempted to extort Ford in Michigan, and Ford has not (and cannot) allege that DSM ever made any contacts (written or oral) with any individual or entity in Michigan. As the Panavision court noted, "we agree that simply registering someone else's trademark as a domain name and posting its website on the Internet is not sufficient to subject a party domiciled in one state to jurisdiction in another." Thus, even if it is assumed that DSM illegally registered a Ford mark on the Internet, that conduct alone is not sufficient to invoke jurisdiction in Michigan.

Under Ford's view, in fact, the mere placing of a classified add in the New York Times would subject someone to suit in a foreign country, given that the New York Times has worldwide distribution. While the newspaper (as the website operator) itself may expect that it subjects itself to suit in jurisdictions where it is distributed, an individual who posts a classified in that paper certainly does not. Ford's selective citation to Panavision misses the mark, and would turn jurisdictional requirements and due process in Internet cases upside down.[4]

Fortunately, the cases which support jurisdiction in the context of Internet claims do not, as Ford would propound, dictate jurisdiction wherever a potential plaintiff may have access to a phone line. Instead, these Internet cases, when boiled down, follow traditional notions of jurisdiction requiring "something more" than mere advertisement on the Internet. In the case at bar, some defendants may have subjected themselves to jurisdiction under these principals, by

---

[4] Similarly, Ford misses the point of the Sixth Circuit's decision in CompuServe, Inc. v. Patterson, 89 F.3d 1257 (6th Cir. 1996), which found jurisdiction over a non-resident because (1) he had entered into contracts that would be governed by Ohio law with an Ohio-based company; and (2) he sent his software, via electronic links, to Ohio and advertised his product on CompuServ's Ohio-based network. It did not find jurisdiction simply because the Internet could be accessed in Ohio.

4

registering trademarks identical to Ford's marks, by establishing or engaging in interactive activities on the Internet, or by attempting to extort Ford in Michigan. **Ford has alleged no facts to support such conduct or activity, however, as against DSM.** Under these circumstances, Ford simply has not alleged facts to support a claim that DSM is analogous to the defendant in Panavision or has purposely availed itself of jurisdiction in the state of Michigan.[5]

Finally, in an apparent attempt to show "bad faith" or to show a similarity to the blatant extortion activities involved in Panavision, Ford justifies jurisdiction by pointing to the fact that DSM allegedly sought "over $600,000.00" for its domain name. What Ford elects to ignore, however, is that the "price" which DSM listed for its domain name ("$656,667.00") was not a price at all. It was a reference to 1965, 1966, and 1967 classic Mustangs - - - something which would be obvious to the very same classic car enthusiasts that Ford thinks would be confused by DSM's use of the term "stang". Moreover, those are cars which Ford has not made in over thirty years!

### III. CONCLUSION

DSM respectfully requests this Court to grant it's Motion to Dismiss based on a lack of jurisdiction. If Ford can (pursuant to Rule 11) allege facts sufficient to establish jurisdiction under the principals set forth in Panavision and CompuServe, then Ford should be required to do so in its pleadings. If, on the other hand, Ford lacks a Rule 11 basis to assert such allegations, then it should not be permitted to force DSM to defend claims in a foreign jurisdiction simply for its own convenience.

---

[5] Instead, what Ford asserts to prevail on its jurisdictional argument are legal conclusions based on the legal counts that it alleges. If that were the standard, the test for jurisdiction would be merely to determine whether or not a tort is alleged. If so, jurisdiction would always be found. Obviously, Ford's over-simplification turns jurisdictional analysis upside down and should not be tolerated by this Court. If Ford wants to force defendants from all across the country to appear in the state of Michigan, then Ford should be forced at least to allege specific facts as to those defendants demonstrating a purposeful availment and a reasonableness for asserting such jurisdiction.

Moreover, DSM should be awarded its reasonable attorney's fees and costs in this matter as a prevailing party under the Anti-Cybersquatting Act should this Court grant its Motion to Dismiss. Fees are also proper under 28 U.S.C. Section 1927, which authorizes attorney's fees as follows:

> "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct".

Upon receipt of the action, DSM offered to transfer the domain name in question, without charge, and confirming that DSM had no resources or intention to fight Ford over the name. However, Ford has continued to pursue the matter in what appears to be an attempt by Ford to "make new law", at the expense of defendants who can surely not afford that luxury.[6]

ORIGINAL of the foregoing sent via
U.S. Mail to:

Clerk of the Court
United States District Court
Eastern District of Michigan
231 W. Lafayette Blvd.
Detroit, MI 48226

COPY of the foregoing sent via
U.S. Mail to:

Scott Ryther, Esq.
HOWARD, PHILLIPS & ANDERSEN
560 E. 200 South, Suite 230
Salt Lake City, Utah 84102

By: _____

40581008.WPD

---

[6] While Ford argues that large corporations should not be forced to compromise their claims merely because they are large corporations, such statement misses the mark. Ford itself offered a specific compromise, and agreed to file Notice with the Court to extend DSM's Reply date pending documentation of that settlement. In four weeks, Ford appears not to have filed any such Notice, requiring DSM to expend the fees and costs needed to brief this Reply and to seek an extension to do so.