# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**FORD MOTOR COMPANY,** *et al.*

**Plaintiffs**

v.

Case No. 00-CV-71544-DT

**GREAT DOMAINS.COM,** *et al.*

Hon. Robert H. Cleland
United States District Judge

**Defendants.**

/

## FED. R. CIV. P. 54(d)(1) and (2) MOTION AND SUPPORTING MEMORANDUM OF HANS REKESTAD ENTERPRISES AND ELECTRONIC FRONTIER FOUNDATION FOR COSTS AND FEES

Eric C. Grimm (P58990)
**CYBERBRIEF, PLC**
320 South Main Street
P.O. Box 7341
Ann Arbor, MI 48107-7341
734.332.4900

COUNSEL FOR THE ELECTRONIC
FRONTIER FOUNDATION AND
HANS REKESTAD ENTERPRISES.



## QUESTIONS PRESENTED

1.  Under 28 U.S.C. § 1919 and FED. R. CIV. P. 54(d)(1), are taxable costs in the amount of $1000.00 (for taxable duplication expenses) to be awarded to Hans Rekestad Enterprises and the Electronic Frontier Foundation as prevailing parties?

2.  Under 15 U.S.C. § 1117(a)(3) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."), should these particular prevailing parties (the EFF and Rekestad, but not Brown, Cooper, Emmert, Fiero, Hall, or Rawson, who have all voluntarily elected not to claim fees) in this ground-breaking and clearly **exceptional** lawsuit be awarded a reasonable attorneys' fee and nontaxable expenses (legal research expenses, postage, mileage and other items) in the approximate total amount of $35,000.00 (only a tiny fraction of well in excess of $200,000 in time and resources that has been invested by the EFF and counsel in this lawsuit)?

## MOST RELEVANT AUTHORITIES

15 U.S.C. § 1117(a)(3) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").

28 U.S.C. § 1919 ("Whenever any action or suit is dismissed in any district court, the Court of International Trade, or the Court of Federal Claims for want of jurisdiction, such court may order the payment of just costs.")

28 U.S.C. § 1927 ("Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings [against Hans Rekestad] in any case [for two whole years] unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.").

FED. R. CIV. P 54(d):

**(d) Costs; Attorney's Fees.**

(1)  *Costs Other than Attorneys' Fees.* Except when express provision therefor is

made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Such costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

(2)     *Attorneys' Fees.*

(A)     Claims for attorneys' fees and related nontaxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial.

(B)     Unless otherwise provided by statute or order of the court, the motion must be filed and served no later than 14 days after entry of judgment; must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought. If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made.

(©)     On request of a party or class member, the court shall afford an opportunity for adversary submissions with respect to the motion in accordance with Rule 43(e) or Rule 78. The court may determine issues of liability for fees before receiving submissions bearing on issues of evaluation of services for which liability is imposed by the court. The court shall find the facts and state its conclusions of law as provided in Rule 52(a), and a judgment shall be set forth in a separate document as provided in Rule 58.

(D)     By local rule the court may establish special procedures by which issues relating to such fees may be resolved without extensive evidentiary hearings. In addition, the court may refer issues relating to the value of services to a special master under Rule 53 without regard to the provisions of subdivision (b) thereof and may refer a motion for attorneys' fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter.

(E)     The provisions of subparagraphs (A) through (D) do not apply to claims for fees and expenses as sanctions for violations of these rules or under 28 U.S.C. § 1927.

Scotch Whisky Ass'n v. Majestic Distilling Co., Inc., 958 F.2d 594, 599 (4th Cir. 1992).

Noxell Corp. v. Firehouse No. 1. Bar-B-Que Restaurant, 248 App. D.C. 329, 771 F.2d 521, 524-26 (D.C. Cir.) (Ginsburg, J.), *reh'g en banc denied*, 774 F.2d 1180 (D.C. Cir. 1985).

The Procter & Gamble Co. v. Amway Corp., No. 00-20127, ___ F.3d ___ (5th Cir. Jan. 17, 2002).

Ale House Mgmt., Inc. v. Raleigh Ale House, Inc., 205 F.3d 137, 144 (4th Cir. 2000) (describing multifactor test for determining when prevailing defendants should recover fees).

Door Sys. Inc. v. Pro-Line Door Sys., Inc., 126 F.3d 1028, 1032 (7th Cir. 1997) (Posner, J.) ("[A] suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value").

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# <u>SOUTHERN DIVISION</u>

**FORD MOTOR COMPANY,** *et al.*

    **Plaintiffs**

    v.                          Case No. 00-CV-71544-DT

**GREAT DOMAINS.COM,** *et al.*      Hon. Robert H. Cleland
                                   United States District Judge

    **Defendants.**

                                  /

---

### FED. R. CIV. P. 54(d)(1) and (2) MOTION OF HANS REKESTAD ENTERPRISES AND ELECTRONIC FRONTIER FOUNDATION FOR COSTS AND FEES

JAERNA, Sweden — When Hans Rekestad set out [perfectly legally] to sell old Volvos and spare parts on the Internet, he never dreamed he would descend into a war with Ford Motor Co., that would involve a $100,000 lawsuit, [false and completely un-substantiated][1] allegations of "cyber-squatting" and a national hubbub that would bring television crews swarming to his weathered wooden farmhouse. . . . Never mind that Mr. Rekestad a former rally-race driver, has grease under his fingernails, no employees and just a tiny basement office with a concrete floor and no heating. Nor that he'd rather be fixing up a 1951 Volvo 444 or reading a Guenther Grass novel than talking to lawyers about trademarks and Internet domain names. . . What ensued offers a window on Ford's love-hate relationship with the Internet . . . .

Almar Latour & Scott Miller, *Ford Cracks Down on Use of Volvo Copyright On Web*, THE WALL

STREET JOURNAL (Oct. 20, 2000), Tab A.

Congress intended to authorize fees for defendants [like Rekestad] subjected to

---

[1] It is perfectly clear that the only persons guilty of **extortion** here – namely, of using a lawsuit to hold Mr. Rekestad hostage, all the while demanding a cash payment of several thousand dollars from Rekestad, are FORD's counsel. It is undisputed that Mr. Rekestad has never solicited any of Plaintiffs for any transaction involving < ClassicVolvo.com > and has always refused to sell, transfer or arbitrage <ClassicVolvo.com > in any way to any of them.

-1-

"harassment" by trademark owners. *See* S.REP. No. 1400, 93d Cong., 2d Sess. 6 (1974). We are persuaded that [Hans Rekestad Enterprises] and its proprietor [Mr. Rekestad], haled before a court some 3000-miles [or more] from the place of [Rekestad's] activity, have encountered "harassment" of the kind Congress meant to deter and that, in obtaining dismissal of the proceeding in the distant forum, [HRE] and [Rekestad] qualify as "prevailing parties" under the Lanham Act fee award provision.

Noxell Corp. v. Firehouse No. 1. Bar-B-Que Restaurant, 248 App. D.C. 329, 771 F.2d 521, 524-26

(D.C. Cir.) (Ginsburg, J.), *reh'g en banc denied*, 774 F.2d 1180 (D.C. Cir. 1985).

[Rekestad's Classic Volvo Business], we observed, has no office or employees outside [Sweden]. At the time [Ford, only a 50% investor in the Swedish company Volvo Trademark Holding, AB] lodged its complaint [in Detroit], [absolutely none] of [Rekestad's] product[s] [or services] had been sold in the District.

*Id.* (also noting that "This number of cases amounted to less than 1.5% of Firehouse's total barbeque

sauce sales. By contrast, 40% of Firehouse's total barbeque sauce sales occur in California.").

These statements from the congressional record demonstrate that Congress sought to **prevent the ACPA from being trolled as dragnet**, catching every small-fry Internet user whose domain name happens — in some small degree — to correspond with a protected trademark. According to the EFF Defendants, however, **that is exactly what Ford has done in this lawsuit**, naming as a defendant every seller listed at "greatdomains.com" whose domain name incorporates a Ford mark. Moreover, the EFF Defendants note that Ford has aimed no specific allegations against any of them individually . . . . [T]he court finds merit in [this] positio[n] ...

Order (Dec. 20, 2001) (emphasis added), *in* Ford Motor Co. v. Great Domains, Inc., No. 00-CV-

71544 (E.D. Mi. *filed* March 2000).

Of course, this case involves far more than an improper and unlawful **dragnet**. More than

that, it consists of nothing more nor less than an extortionate and unlawful **shakedown** of innocent

small businessmen from all over the world – to the tune of US $3000.00, or even multiples of $3000,

apiece. Hand Rekestad himself was personally subjected by Ford's counsel to such a **shakedown**

attempt, continually from March 2000 through February, 2002 – as were each of the other EFF

Defendants continually and without interruption from March 2000 through January, 2002.

-2-

Ford's counsel have been made aware at length about the specific facts surrounding Hans Rekestad's legitimate plans for < ClassicVolvo.com >. In fact, Ford's lawyers have even admitted to EFF counsel that Ford's lawyers have regularly read the contents of Mr. Rekestad's < ClassicVolvo.com > Website, which has addressed this litigation (and the extraordinary psychological injury intentionally inflicted by FORD on Mr. Rekestad), as well as coverage of the case in the press (by the Wall Street Journal, among others) at considerable length. See Tab A, Tab B. FORD's lawyers knew full well from March 2000 to the present they never had any legitimate reason to go after Rekestad. And yet they deliberately perpetuated and multiplied both the litigation and the **shakedown**. They did it out of greed and without a shred of principle. U.S. $3000.00 times 100 or more addresses is a lot of money (for lawyers, at least, not for FORD) – especially if the Complaint consists of nothing more than a cursory boilerplate list of Defendants, without any party-specific detail, and the victims are not expected to be able to have resources to mount a defense through discovery and summary judgment.

They knew that Mr. Rekestad was never trying to sell "ClassicVolvo.com" to any of the Plaintiffs. He **WAS** (FORD knew) completely legitimately trying to find independent investors not affiliated with FORD, and he hoped to keep the address for himself, after persuading (he hoped) investors to finance a joint venture with him to expand his pre-existing business over the Internet. See Tab B. FORD's lawyers knew full well that they had no basis whatsoever to attempt to assert personal jurisdiction over Mr. Rekestad (he has never done business in or with Detroit). They never even bothered to try to serve him. And they also knew (as this court **pre-emptively** held because Plaintiffs' "*in rem*" theory was so completely baseless and contrary to fundamental tenets of Due Process), but purposefully concealed from Judge Rosen, that there was no way consistent with Due Process to adjudicate Mr. Rekestad's rights in Detroit.

-3-

FORD's lawyers knew that the trademark "VOLVO" does not even belong to any Detroit entity – but rather belongs to a Swedish corporation in Gotenburg, Sweden (Volvo TM Holding, AB is only 50% owned by FORD). In short, Ford knew that the expansion of its dragnet to sweep up claims involving Volvo and Rekestad – were always in **bad faith** and never had any legitimate basis whatsoever. And yet, they took two years before lifting a finger to put an end to the damage they had inflicted in bad faith on Hans.

In short – through the deliberate and wrongful perpetuation of the Detroit litigation, including **exactly** the 3000-mile forum-shopping "harassment" tactics that the D.C. Circuit held in <u>Noxell</u> are prohibited by Congress, such that FORD's tactics rightfully trigger an award of attorney's fees – Ford's lawyers from March, 2000 through February, 2002 intentionally left a $100,000 lawsuit hanging over Mr. Rekestad's head like the Sword of Damocles, and repeatedly told him that he could not extract himself from the suit without payment of $3000.00 (and surrender of his own rightfully-registered property).

**Who, exactly, needs to be "protected" from "extortion" under these circumstances,** Judge Cleland? We respectfully submit that Hand Rekestad needs to be protected, and that Ford's counsel (the same lawyers who personally spearheaded the drive to purchase the "Cybersquatting Act" from former Senator Abraham and Congressman Rogan during the 1999-2000 election cycle) are using the legislation they bought and paid for as a "sword" and **emphatically *not* as a "shield" against any colorable infringement whatsoever,** in a reverse-Robin-Hood shakedown of small businesspeople worldwide. Greg Phillips and crony local counsel in several judicial districts have filed repeated "dragnet" lawsuits employing the same or similar tactics.

Mr. Rekestad was not the only Defendant in <u>this</u> case who was subjected to the $3000.00 - a - pop extortionate **shakedown** tactics of FORD's lawyers. Prior to the entry of the Electronic

Frontier Foundation into this lawsuit, FORD's lawyers had already shaken down (for several thousand dollars) the owner of < Fordsucks.com > (thereby permanently preventing the legitimate use of this address for criticism, because Ford can now unilaterally keep the address completely out of the "marketplace of ideas").[2]

When EFF and *pro bono* counsel entered the case in November, 2000, Ford's lawyers had already shaken down (and taken payments from) literally dozens of people (1) who in March, 2000 (or even in November 2000), could not possibly have had the hindsight benefit of this Court's post-hoc retroactive pronouncement on December 20, 2001, that people posting Domain Names at Great

---

[2]Remember, the mere offering of a non-identical Domain Name for sale via Greeat Domains never by itself constitutes "cybersquatting" because **FORD has no obligation** to buy. If Ford is free and perfectly willing to say, "No thank you," or just to ignore the posting (which might be interesting to many others, then there is no element of "extortion" or any action specifically directed **at** FORD (as opposed to direction toward thousands of potential good-faith third-party purchasers worldwide). In Rekestad's case, there was no effort to arbitrage at all, but rather to attract the attention of invesors (not affiliated with FORD at all).

We respectfully suggest that the Court has failed fully to appreciate the adverse one-way-ratchet effect upon free speech and small business of its "give the name for free to FORD whenever you drop your business plan" approach. After all, once addressing rights fall to the FORDs of the world (and we – again – challenge the Court to determine for itself how many words exist in the English language that are not trademarked by somebody for something), these addressing rights (on such addresses as < FordSucks.com >) can be expected never to become available again for any new publishers or market entrants – thereby adversely effecting not only legitimate expressive activity, but also adversely effecting exactly the kind of entreprenurial activity by small business that should be fostered and encouraged, not thwarted and punished. Incidentally, the legislative history of the Cybersquatting Act hardly suggests that any of the EFF Defendants this Court has subjected to its posited post-hoc "give it up for free" rule were ever viewed by Congress as "cybersquatters," or that Congress ever intended the statute (as discussed in the legislative history) as a mechanism to use the threat of litigation to extort the transfer of names that small businesspeople registered without any bad-faith intent. Indeed, we respectfully suggest that this Court's retroactive shifting of the burden of proof (presuming "bad faith" unless demonstrated otherwise by the party who does **not** have the burden of proof) and retroactive announcement of a posited "give it up for free" rule (of which nobody had any notice prior to December 2001), is inconsistent with the legislative history of the 1999 "Cybersquatting Act." Indeed, the posited "give it up for free" rule is inherently inconsistent with the free-market, andti-litigation pro-small-business philosophy and ideology of Spencer Abraham and James Rogan.

Domains can expect to be put to the expense of open-ended discovery and protracted litigation, if they don't submit to FORD's shakedown and cough up thousands of dollars to Ford's already well-compensated counsel, and (2) many of whom had posted addresses on Great Domains **before** the passage of the "Cybersquatting Act" (making it completely unfair to apply the change in law retroactively to them).

At the time that the EFF came into the lawsuit (at great expense to counsel and without charging any money to clients who could not afford representation), Wally Rawson had **already** signed transfer papers assigning his addresses to FORD. **FORD's lawyers were asked by EFF counsel in November, 2000 to drop their money claims against Rawson and just keep the name.** Ford's lawyers declined. They wanted their pound of flesh ($3000 for 4FordParts and $3000 for 4FordTrucks) from Rawson on top of the address that had already been assigned. Never mind that Rawson had never done anything wrong or unlawful – and certainly never had any plans to engage in arbitrage with FORD. Ford's lawyers wanted lots and lots of money from everybody who had been caught in the dragnet of the new statute that they had purchased and that they sought to apply retroactively to Rawson, Rekestad, Hall, Brown and everyone else. Likewise, in the cases involving Fiero, Emmert, and Hall, Ford knew (and was told) that those cases could have easily been resolved in November, 2000, if only FORD had dropped its demand for $3000 a pop for each Domain Name. (Later, in January, 2002, EFF counsel wanted to litigate these cases out and to seek fees in the end, but we also had a duty to our clients who just wanted to be left alone and to have the extortion end, so we communicated FORD's changed position to them as was our duty and accepted their decisions to settle).

Ford did not drop its money demands against these EFF clients until January, 2002. As soon as it did, several of the EFF Defendants were (as counsel were obligated to do) offered the option

of having the lawsuit dismissed with prejudice in exchange for the transfer of the Domain Names and no exchange of money. These clients had the right to accept their settlements.

That outcome, form the standpoint of diversity of expression and promotion of the public interest, is far from ideal (although FORD has clearly conceded with respect to the Rekestad, Brown, and Cooper Websites that fan Websites, animal Websites, parts dealers and sellers of used vehicles, are all legitimate good-faith Internet uses that are not and should not be prohibited by trademark law – no matter what FORD's brand managers and lawyers may personally think of these activities). But the settlement of several other cases represents the upshot of the leverage (including the threat of $100,000 in punitives – which Brown, Hall, Emmert, Cooper, Rekestad and others legitimately feared might be used to deprive them of their homes, if this Court turned out – as we feared – to be too favorably disposed toward a large local Detroit employer) that has been put in FORD's hands as a result of the statute that the Howard, Phillips & Andersen Law Firm purchased from some friendly and ideologically-aligned Members of Congress facing tight re-election races.

The basic thrust of this Motion is simply to level the playing-field at least to a tiny degree (fully evening it would require disgorgement of over $100,000 in "shakedown" money FORD's lawyers have collected so far, and then imposition of attorney's fees on top of that). In the **next** case, unless Defense counsel in **this** case are compensated, at least in part, for the hard work they have done, it is fair to predict that **nobody** at all will stand in the way of the steamroller tactics of the FORDs of the world. We just simply cannot afford it. Nor can the kinds of clients that FORD named as defendants afford to mount a defense under the set of rules that this Court has now retroactively imposed (i.e., everyone goes through discovery before there is any chance of getting out). In short, this is exactly the kind of case in which it is especially crucial that defense counsel recover at least **some** reasonable fees for their efforts – in order to make sure that **all** sides of the

issues are fairly represented in this kind of litigation.  This cannot happen unless the courts preserve proper, balanced, financial incentives.

As great as many of the injustices inflicted by FORD have been in this litigation, there is little doubt that things would have been far worse if the EFF and CyberBrief had not stepped up to the plate to go to bat for the public interest and to make sure that the law (like the Due Process Clauses of the Constitution) actually was followed.  How many times and how often is **that** (namely, lawyers taking the risk of expensive and protracted litigation) going to happen if we are forced to eat the entire expense of representation -- even when we achieve the important, tangible, results we have achieved here (especially for Mr. Rekestad)?

If at least the modest fees requested (only $36,000 out of over $200,000 incurred) are not awarded in this case, then what kind of signal is that going to send to every other lawyer and law firm in the Eastern District of Michigan concerning successful *pro bono publico* public interest representation?  What kind of signal is that going to send to every small publisher on the Internet (many of whom have been watching this case quite closely)?

In the case of Hans Rekestad, the applicability of the forum-shopping and "harassment" line of attorneys-fee cases, such as <u>Noxell</u>, is perfectly clear and persuasive.  An award of reasonable attorney's fees (and we only ask for approximately $36,000 out of more than $200,000 in time and resources invested in this defense) will certainly send a badly-needed message to FORD and to the Howard Phillips & Andersen law firm to do their homework more carefully before casting the **dragnet** so far and wide.

---

**Motion:**  In light of the foregoing considerations, and in the wake of FORD's recent filing of papers dismissing all claims against Hans Rekestad Enterprises (making Rekestad a "prevailing

party" for purposes of his defense – particularly on the cutting-edge issue of *in rem* jurisdiction), Defendant Hans Rekestad Enterprises, along with the Electronic Frontier Foundation, respectfully moves for an award of reasonable costs and attorneys fees incurred in the defense of issues pertaining to Mr. Rekestad.

Rule 54(d) states that "[T]he motion must . . . specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought." These three items are set forth as follows:

**The Judgment:** The Judgment pertaining to Rekestad and entitling Rekestad and the EFF as "prevailing parties" (especially on the *in rem* issue as well as on other issues) to seek fees related to the Rekestad dismissal is the Notice of Dismissal (Dkt. #164) of all claims against Hans Rekestad Enterprises, in Civil Action No. 00-CV-71544, dated February 22, 2002, which dismissal was discussed with the Court in the conference held on February 11, 2002.

**Statute Entitling Rekestad / EFF To Fees:** 15 U.S.C. § 1117(a)(3), governing remedies in trademark cases, says that "The court in exceptional cases may award reasonable attorney fees to the prevailing party." Not only may a prevailing <u>defendant</u> in a lawsuit under the Lanham Trademark Act recover fees under section 1117, but the standard of proof for a prevailing <u>defendant</u> is different than that for the prevailing plaintiff, in order to establish the case is "exceptional," triggering an award of fees in a reasonable amount. <u>Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.</u>, 958 F.2d 594, 599 (4th Cir. 1992); <u>see also</u> <u>Noxell Corp. v. Firehouse No. 1. Bar-B-Que Restaurant</u>, 248 App. D.C. 329, 771 F.2d 521, 524-26 (D.C. Cir.) (Ginsburg, J.), *reh'g en banc denied*, 774 F.2d 1180 (D.C. Cir. 1985); <u>The Procter & Gamble Co. v. Amway Corp.</u>, No. 00-20127, ___ F.3d ___ (5th Cir. Jan. 17, 2002); <u>Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.</u>, 205 F.3d 137, 144 (4th Cir. 2000); <u>Door Sys. Inc. v. Pro-Line Door Sys., Inc.</u>, 126 F.3d 1028, 1032 (7th Cir. 1997) (Posner,

J.) ("[A] suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value").

Here, we think that a **Swedish** dispute was improperly forum-shopped into Detroit, for the calculated purpose of multiplying the "nuisance value" of the suit, and that the Plaintiffs never had any good faith belief whatsoever in either the viability of any claims they brought against Rekesad, or the assertion of jurisdiction in Detroit. The entire course of conduct by Plaintiffs was motivated out of *bad faith* and was calculated to subject Mr. Rekestad to an unlawful shakedown.

We also rely on 28 U.S.C. 1927 as a ground for seeking fees.

**Fair Estimate of the Amount Sought:**      The estimated total amount of attorneys' fees sought is $33,750.00 (150 hours at $225.00 per hour). In addition, $1250.00 for non-taxable legal research and ancillary expenses (Westlaw, mileage, postage, long distance, etc.) is sought. If the amount of the requested award is contested by Ford Motor Company, Defendants (through counsel) shall submit an affidavit setting forth with specificity the basis for the request for fees and nontaxable expenses. Alternatively, the Court may establish a procedure for determining the amount of the award in accordance with Rule 54(d)(2).

Although the Court has not required the disclosure of any fee arrangement, counsel for the EFF Defendants respectfully state that the fee arrangement with each of the EFF Defendants is set forth in a written agreement, and provides that counsel shall have the right to seek fees if available from the Court. No fees whatsoever have been collected from any of the EFF Defendants, so our entire compensation for this *pro bono* representation (if any) rides entirely on this fee request. A copy of any agreements with any individual EFF Defendants shall be provided to the Court if it so requests.

-10-

In short, counsel (especially CyberBrief, which unlike EFF staff, is not on the EFF payroll) took a considerable risk of eating a lot of fees – in order to make it possible, financially, for the EFF Defendants to present a legal defense in a truly exceptional, precedent-setting and ground-breaking legal case, with important policy implications for the entire future of the World Wide Web.

## **PRAYER FOR RELIEF**

For the foregoing reasons, Defendants respectfully pray for an award of costs in the amount of $1000.00, and for a reasonable award of attorneys' fees and nontaxable costs of $35,000.00.

Respectfully submitted,

**EECTRONIC FRONTIER FOUNDATION and HANS REKESTAD ENTERPRISES,**

By counsel,

March 27, 2002

Eric C. Grimm (P58990)
**CYBERBRIEF, PLC**
320 South Main Street
P.O. Box 7341
Ann Arbor, MI 48107-7341
734.332.4900

COUNSEL FOR EFF and HANS REKESTAD ENTERPRISES.

-11-

## CERTIFICATE OF CONFERENCE

I, Eric C. Grimm, respectfully state that I placed a call to Kathleen Lang, counsel for the Plaintiff, on March 27, 2002, about seeking costs and fees on behalf of the Defendants, and seeking her consent.  Ms. Lang did not consent at that time or return my call in time to determine of the Motion is contested.   I also spoke with Scott Ryther on or about March 12 or 13, 2002, at which time Mr. Ryther told me that our Motion for Extension of Time was not opposed, but that the fee petition would be opposed.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: March 27, 2002

-12-

## SUPPORTING MEMORANDUM

In support, Hans Rekestad Enterprises and the Electronic Frontier Foundation, through counsel, respectfully state:

In Door Sys. Inc. v. Pro-Line Door Sys., Inc., 126 F.3d 1028, 1032 (7th Cir. 1997), Judge Posner recognized that "[A] suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value." The Detroit lawsuit against Hans Rekestad (which has willfully been perpetuated from March 2000 through February 2002) is **oppressive** and therefore "exceptional" for purposes of section 1117 of the Lanham Trademark Act, for even more reasons than the triggering minimum under Door Systems. To wit:

a.  The Plaintiffs and counsel have **never** had any "evidentiary support" whatsoever, based on any "inquiry reasonable under the circumstances" (namely, bothering to **look** at the Website that Rekestad has published since 1996), see FED. R. CIV. P. 11, to support any "honest" or "good faith" belief in the prosecution of any substantive claims against Hans Rekestad.

b.  The Plaintiffs and their counsel actually knew the contents of Rekestad's Website and the nature of his pre-existing business, and yet willfully failed to reflect that knowledge in their cut-and-paste pleadings; thus, they deliberately swept him up in their "dragnet" even though they knew the facts affirmatively refuted any claim against him on the merits.

c.  Moreover, on the subject of **jurisdiction**, Plaintiffs (especially Volvo Trademark Holding AB) clearly knew that there existed absolutely no evidentiary basis or reason whatsoever to attempt to subject Mr. Rekestad to jurisdiction in Detroit.

d.  Indeed, there was no possibility that the Plaintiffs could have acted in good faith or innocently when it came to forum-shopping claims involving Mr. Rekestad, because

Page 1

Plaintiffs **knew** that Volvo Trademark Holding AB, is not headquartered or incorporated in Detroit, but is Swedish, and that FORD is only a 50% shareowner.

e.    Any "*in rem*" theory of Detroit jurisdiction was so completely and objectively preposterous[3] that this Court, on December 20, 2001 **pre-emptively** prohibited the Plaintiffs from attempting to proceed on any *in rem* theory.   Plaintiffs knew about <u>Shaffer v. Heitner</u> and <u>Rush v. Savchuk</u>, 444 U.S. 320 (1980), and yet deliberately disregarded and failed to address these controlling precedents -- in order to perpetuate the litigation Sword of Damocles hanging over Mr. Rekestad's head, by asserting a theory against Mr. Rekestad that they knew (and that this Court clearly held) violated fundamental principles of Due Process.

f.    The cost of defending Mr. Rekestad's rights has been quite high -- especially because FORD deliberately multiplied the burden and expense of defense by shopping the lawsuit to an improper forum thousands of miles away from Mr. Rekestad's home in Sweden.

g.    The primary purpose of Plaintiffs' counsel was to abuse not just the "nuisance value" of litigation in an effort to extort US $3000 from Rekestad (and take his lawfully-registered property away from him) -- but their purpose was clearly to abuse the extreme coercive leverage of the lawsuit (and to multiply that leverage by using the fulcrum of intercontinental forum-shopping) in order to extort and intimidate Mr. Rekestad.

There are lots of other reasons to consider FORD's "dragnet" and "shakedown" tactics of litigation

---

[3]The Howard, Phillips and Andersen law firm directly participated in the one-sided legislative process (people representing the public interest were deliberately cut out of opportunities to testify about the vastly more pronounced and serious problem of reverse-hijacking that has only multiplied since the legislation passed) that led to the passage of the "Cybersquatting Act" and HP&A fully knew -- as numerous courts have repeatedly pointed out -- that their willful mis-reading of the "*in rem*" sections of the ACPA controverts not only the legislative history of the statute and its plain language, but also basic concepts of common sense and fundamental principles of Due Process.

against much smaller and financially less powerful opponents to be "oppressive" in the extreme and worthy not only of an award of attorney's fees, but also an order requiring the Howard Phillips & Andersen Law Firm to disgorge the $3000-per-domain-name "lunch money" that the bullies at FORD have been collecting from innocent businessmen as the cost of being let out of the dragnet. But this Motion for Fees only addresses the claims of Rekestad and the EFF – not the other Defendants named in the Complaint. The "oppression" of Rekestad was especially pronounced – perhaps moreso than any other Defendant named in FORD's dragnet lawsuit.

In demonstrating why an award of attorneys' fees is proper, as pertaining to Rekestad and the EFF, it is also helpful to look to the multi-factor test set forth by Judge Niemeyer in the Ale House Management case. First of all, the findings of the District Court in Ale House (which Judge Niemeyer and the Fourth Circuit concluded were not an abuse of discretion) were directly analogous to the situation of Rekestad in this case:

> In awarding attorneys fees, the district court observed that AHM (1) alleged erroneous facts due to reliance on a form complaint; (2) failed to tailor its factual allegations to fit this case; (3) withdrew a federal anti-dilution claim after Raleigh Ale House pointed out its inapplicability; and (4) is a successful company that used its resources to hinder Raleigh Ale House's business venture.

Ale House Mgmt., Inc. v. Raleigh Ale House, Inc., 205 F.3d 137, 144 (4th Cir. 2000). Here, FORD's anti-dilution and infringement claims have been tossed out of court (based on failure to plead any facts that might state a claim upon which relief might be granted) because FORD's assertion of these boilerplate counts was objectively unreasonable and improper. Moreover, as this Court itself has pointed out, FORD's allegations against Rekestad individually mirrored the boilerplate, dragnet, undifferentiated allegations that were set forth against each individual defendant. As such, FORD's lawyers deliberately chose **not** to tailor their pleadings to the individual Defendant (they had already looked at Rekestad's Website, and knew telling the truth would undermine their case). And it is

Page 3

perfectly clear that FORD Motor Company is one of the largest multi-national industrial conglomerates that the world has ever seen[4] and that FORD and its lawyers have clearly "used their resources to hinder" and intimidate Mr. Rekestad and his business venture.  As the Fourth Circuit held in the Ale House case:

> Under the Lanham Act, a prevailing defendant may recover attorneys fees in an "exceptional" case, necessitating a showing of "something less than bad faith." Scotch Whisky Ass'n v. Majestic Distilling Co., 958 F.2d 594, 599 (4th Cir. 1992) (quoting Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant, 771 F.2d 521, 526 (D.C. Cir. 1985)).  Relevant factors include "economic coercion," "groundless argument[s]," and failure to cite controlling law.  Noxell, 771 F.2d at 526-27.

> We have instructed district courts, when exercising their discretion under the Copyright Act, to consider: "(1) the motivation of the parties; (2) the objective reasonableness of the legal and factual positions advanced; (3) the need in particular circumstances to advance considerations of compensation and deterrence; and (4) any other relevant factor presented." Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., 74 F.3d 488, 498 (4th Cir. 1996) (citing Rosciszewski v. Arete Assocs., Inc., 1 F.3d 225, 234 (4th Cir. 1993)).

Applying the Ale House factors, it is perfectly clear that an award of attorneys fees is necessary in this case, in order to make sure that FORD and other companies like it will be deterred from acting the same way in the future.  It is important to teach the FORDs of the world that shakedowns and dragnets do not pay.  The factors are set forth as follows:

**Economic Coercion:** As set forth above, FORD has clearly attempted to exercise improper economic coercion (so much so that Rekestad was asked for US $3000 in "lunch money" on top of

---

[4]The 2000 listing of the Fortune 500 should be helpful to put things in perspective:

| 1 | Exxon Mobil | 210,392.0 |
|---|---|---|
| 2 | Wal-Mart Stores | 193,295.0 |
| 3 | General Motors | 184,632.0 |
| **4** | **Ford Motor** | **180,598.0** |
| 5 | DaimlerChrysler | 150,069.7 |
| 6 | Royal Dutch/Shell | 149,146.0 |
| 7 | BP | 148,062.0 |
| 8 | General Electric | 129,853.0 |

transfer of his legitimately-registered addressing and publishing rights), and that – in the specific case of Rekestad – FORD attempted to multiply the extortionate leverage of litigation by using the fulcrum of transatlantic forum-shopping to multiply the burden on Rekestad.

**Groundless Arguments:** This Court has pre-emptively determined that FORD's *in rem* theory of jurisdiction is objectively groundless and contrary to Due Process. FORD's dilution and trademark claims have also been held to be so objectively groundless that they have been dismissed under Rule 12(b)(2). Finally, with respect to "cybersquatting" (which law had not even passed the Congress at the time Hans Rekestad sought investors through the Great Domains Website) – FORD (having seen Rekestad's Website) knew at the time of filing, and indeed throughout the perpetuation of this lawsuit, that any so-called "cybersquatting" claim against Rekestad was objectively without merit and contrary to the real facts. In short, FORD should never have sued Hans, or should have dropped him out of the case long ago.

**Failure to Cite Controlling Authority:** At the time that FORD first presented its *in rem* proposal to Judge Rosen, FORD deliberately omitted some key and controlling authorities from its pleadings. In particular, FORD completely omitted to tell judge Rosen about the specific pleading requirements (including verification) for *in rem* claims that had not been met. Nor did FORD bother to tell Judge Rosen about the controlling Supreme Court cases of <u>Shaffer v. Heither</u> and <u>Rush v. Savchuk</u> – which this court ultimately relied upon in pre-emptively forbidding FORD from proceeding *in rem*. We respectfully believe that FORD deliberately sought to deceive and trick Judge Rosen by presenting him with a willfully incomplete picture of controlling law.

**The Motivation of the Parties:** As pertains to Mr. Rekestad, numerous signs show that FORD's motivation was improper. Did the Electronic Frontier Foundation have any improper motive? Clearly not. The EFF voluntarily entered the case to defend the public interest *pro bono*

*publico*, and to make sure that this Court had the benefit of full briefing on the issues. Did CyberBrief, PLC have any improper motivation? Clearly not. In the interest of fulfilling its duty to several clients, CyberBrief, PLC has eaten well in excess of $200,000 of legal work – which time could have been spent on paying matters for paying clients, if the firm had been motivated by financial gain and not the public interest. CyberBrief had nothing to gain, financially, from taking the case, and (at best) only stood to break even **if** this Court saw fit to award fees at the end of the case. So undertaking this *pro bono publico* defense clearly involved undertaking an extreme financial risk, in the interest of promoting a common benefit for the public as a whole. Did Hans Rekestad have any improper motive? Clearly not. He was deeply offended by FORD's efforts to shake him down. His existing business of repairing old Volvos (some dating back to the 1950s) is clearly described on his Website, and FORD knew he had done nothing whatsoever improper – **prior** to the time FORD filed its shakedown/dragnet lawsuit. Thus, the only persons involved in this matter exhibiting an improper and oppressive motivation (and there is ample evidence that they acted on such a motivation) were FORD's lawyers and FORD itself.

**The objective reasonableness of the legal and factual positions advanced**: The Court has already addressed this factor and (as pertains to Rekestad), has uniformly held in favor of the EFF and Rekestad, and has uniformly cut off FORD's arguments at a very early stage (a **strong** indication that FORD's positions completely lacked objective merit). Many of the factual and legal positions advanced by FORD are objectively unreasonable, and have been tossed out of Court – either pre-emptively or under Rule 12(b)(2). Especially concerning Mr. Rekestad, and the issue of forum-shopping to Detroit, when Volvo Trademark Holding AB is Swedish, FORD's factual and legal position is and always has been completely preposterous and objectively absurd. In contrast, every single argument advanced on Mr Rekestad's behalf in this case (not all pleadings had to do with

Page 6

Rekestad) by the EFF and counsel has been approved by this Court. Every single one. CyberBrief and the EFF have clearly presented objectively reasonable and correct arguments to this Court on Mr Rekestad's behalf, all of which arguments this Court has accepted. All other arguments that EFF and counsel have advanced (even the ones this Court rejected) have been objectively reasonable and made in good faith. There was at least a legitimate basis in fact and law for each of these arguments, even to the extent that the Court disagreed with specific points.

**The need in particular circumstances to advance considerations of compensation and deterrence**: Both compensation and deterrence are necessary under the circumstances of this specific case. Compensation to counsel is necessary to ensure that the interest of the public can continue to be represented on a *pro bono publico* basis in increasingly-common Internet disputes such as this one. Deterrence is also necessary. To fail to require FORD to pay for its misconduct relating to Mr. Rekestad would send a message not only to FORD, but to big companies and small Internet publishers the world over. It would send a message that "extortion pays," and "the small fry need to get out of the way because the dragnet is coming to get you." Failure to award fees in this case would send a message that the FORDs of the world can shake people down for $3000 a pop, and get away with it without suffering any consequences. Failure to award fees would send a message that anyone who owns a domain name to which FORD objects, or who wants to publish something that FORD doesn't like, will have to pay a "trademark tax" of litigation expenses – and that they cannot get their money back even if they win. Imposition of such a unilateral "trademark tax" on small businesspeople clearly would have a chilling effect on speech and entrepreneurial activity – even if it is perfectly clear that such people would win if they actually paid to go to trial. Both compensation and deterrence strongly counsel in favor of a money award far in excess of what EFF and CyberBrief have here requested.

**Any other relevant factor presented**: There are many such factors.   To wit:

1.       This is an exceptional case.  It is, in fact, truly groundbreaking as among the first to deal with many novel and difficult issues of "Cyberspace Law" and international jurisdiction. It is also "exceptional" because of the vast disparity in resources between the Plaintiffs and the Defendants, and the willingness of *pro bono publico* counsel to go to bat for the public interest and stand up to FORD.

2.       Ford's Complaint in this case, in an evident effort to intimidate and threaten the Defendants, sought the following remedies in addition to injunctive relief:

- •       Damages under 15 U.S.C. § 1117;

- •       "Restitution" under 15 U.S.C. § 1117;

- •       "[E]nhanced damages up to three times the amount found as actual damages" under section 1117(a);

- •       "Punitive damages for . . . oppressive, fraudulent, and malicious acts;"

- •       "Reasonable attorneys' fees and costs of suit" under section 1117(a).

3.       It is hardly surprising or unexpected to FORD – in light of the fact that Rekestad and not FORD is the prevailing party – that Rekestad and the EFF should seek at least one of the five monetary expenses which FORD originally sought to impose on all the Defendants.

4.       Rekestad and counsel respectfully seek to be ***made whole*** for the cost, expense, difficulty and hardship of mounting a legal defense (in a faraway jurisdiction) against a lawsuit – all relevant (to Rekestad, at least) aspects of which were thrown out of court.

5.       Hans Rekestad respectfully seeks to make sure his counsel is ***fairly compensated*** for an extremely challenging and high-rusk representation, involving controversial (and newsworthy) facts and issues, and public policy implications extending far beyond the instant lawsuit.

6.    Rekestad, the EFF, and counsel respectfully seek a reasonable *leveling of the playing-field* in Internet Domain Name cases (in which prevailing trademark plaintiffs often are awarded attorneys' fees[5] – thereby exaggerating an already pronounced *in terrorem* effect of "intellectual property" litigation, the mere threat of which often is used to suppress entirely lawful and Constitutionally protected speech).[6]

7.    Rekestad, the EFF and counsel respectfully seek to *deter* (both for purposes of specific and general deterrence) the widespread practice by very large corporate entities of threatening and prosecuting trademark and other "intellectual property" lawsuits for no other purpose than to censor and intimidate financially weaker persons, forcing them to back off from exercising Constitutionally-protected rights of expression;

8.    Rekestad, the EFF, and counsel respectfully seek a ruling that will serve as a *beacon of hope* – when not only small publishers, but also attorneys who might consider representing them, often have little choice but to give in to censorship because they do not have a clear picture from

---

[5]E.g., Electronics Botique Holding Corp. v. Zuccarini, No. Civ. A. 00-4055, 2000 WL 1622760, 56 U.S. P.Q. 2d 1705 (E.D. Pa. Oct. 30, 2000); Morrison & Foerster, LLP v. Wick, 94 F. Supp. 2d. (D. Colo. 2000).

[6]See Compare Brad Templeton, rec.humor.funny v. MasterCard (Apr. 9, 2001), < http://www.netfunny.com/rhf/jokes/01/Apr/mcrhf.html > (Electronic Frontier Foundation Chairman – atypically – stands up to "Bigfoot letter"), and <http://netfunny.com/rhf/price.html >; with < http://www.rotten.com/legal/ desist-mastercard.html > (the usual response by legitimate non-infringing speakers). Almost all Domain Name registrants – even if engaged in clearly non-infringing conduct – tend not to have counsel and often capitulate in the face of threatening "cease-and-desist" letters. A helpful exercise is to use Google or another search engine to review the results of searches for (1) "cease desist letter," (2) "bigfoot letter," and (3) "cease desist trademark." Although each search will pull up well over 10,000 documents, a fair number within the first hundred or so from each search should be instructive. See also *K2r Produkte AG v. Jeremie Trigano*, Case No. D2000-0622 (WIPO Aug. 23, 2000), < http://arbiter.wipo.int/domains/decisions/html/2000/d2000-0622.html > (Debevoise & Plimpton Law firm – found guilty of "reverse hijacking.").

United States District Courts as to whether people who stand up to and oppose corporate bullying can get their money back if they actually take the gamble of going to court to defend their rights (or the rights of clients).

9.      The alternative – a **failure** to grant attorneys' fees in this case – will also send a clear message.  It will send a terribly **wrong** message to every small publisher on the entire Internet.  The message will be a simple one: "The First Amendment of the United States Constitution *says* it guarantees you freedoms of speech and the press, but if you actually want to *exercise* those rights, it is going to cost you dearly."  The *in terrorem* chilling effects stemming from the threat or anticipation of trademark litigation are clearly evident from the breathtakingly high capitulation rates of recipients of cease-and-desist letters.  See, e.g., Anick Jesdanun, *Big Brother on the 'Net: Commercialization of the Internet May Limit What Users Can Do or Say*, Associated Press (Dec. 21, 2001), *reprinted*, CBS News (Dec. 21, 2001), < http://www.cbsnews.com/now/story/0,1597,321980-412,00.shtml >.  Likewise, concerning individual address-holders (e.g. "FordSucks.com"), consider what the likely outcome would have been for the Defendants, collectively, in this lawsuit – if a handful of the Defendants had not contacted the Electronic Frontier Foundation begging for assistance.

10.      The World Wide Web is widely touted as a global "marketplace of ideas" in which anyone may fairly participate.  But that aspirational objective is increasingly under threat as litigious corporate bullies (Ford is hardly alone in this respect, but FORD's Internet litigation track record is a particularly aggressive one)[7] seek to make it clear that there is a price to be paid by anyone who gets caught engaging in speech of which these companies disapprove.  See, e.g., Anick Jesdanun,

---

[7] E.g., Ford Motor Co. v. Lane, 67 F. Supp. 2d 745 (E.D. Mi. 1998).

*Big Brother on the 'Net: Commercialization of the Internet May Limit What Users Can Do or Say*, Associated Press (Dec. 21, 2001), *reprinted*, CBS News (Dec. 21, 2001).  The question here is whether the few publishers who are willing to take the risk to go to court, for vindication of their rights as publishers, can actually get their money back when they prevail – or whether corporate censors can engage in censorship by imposing a "trademark lawsuit tax" on any Website they find objectionable – which "trademark tax" will eliminate most speech even if the threatened litigation would be found baseless if litigated to its conclusion.

11.    When substantial and important issues of public policy and free speech are at stake, it is hardly unusual for United States District Courts to award reasonable attorneys' fees to the prevailing party. See, e.g., Mainstream Loudon v. Board of Trustees of the Loudon County Library, No. 97-9049-A (E.D. Va. April 1, 1999).  As recognized in Mainstream Loudon, it is quite common in cases that involve special fact-patterns and *pro bono publico* representation, to introduce a multiplier of attorneys' fees, to make sure that the right incentives are created within the legal community for attorneys to take on important and particularly challenging cases.

In closing, the EFF and counsel respectfully believe that under the most persuasive precedents, an  award of reasonable attorneys' fees, in addition to costs, would be just and proper in the instant case. Noxell Corp. v. Firehouse No. 1. Bar-B-Que Restaurant, 248 App. D.C. 329, 771 F.2d 521, 524-26 (D.C. Cir.) (Ginsburg, J.), *reh'g en banc denied*, 774 F.2d 1180 (D.C. Cir. 1985); General Motors Corp. v. Cadillac Marine & Boat Co., 226 F. Supp. 716, 742-44 (W.D. Mich. 1964) (Fox, J.); cf. Three Lakes Ass'n v. Whiting, 75 Mich. App. 564, 574, 255 N.W.2d 686 (1977).

We also respectfully take note of Ford's reputation for extremely rough-and-tumble litigation, e.g., not only the Ford v. Great Domains case (in which Ford's lawyers have attempted to "shake down" dozens of individual Domain Name registrants for $3000.00 a pop), but also for aggressive

Page 11

postures in other litigation.  E.g., Traxler v. Ford Motor Co., 227 Mich. App 276, 286, 576 NW2d

398 (1998).

Indeed, the use of forum-shopping in this case as a fulcrum to multiply coercive leverage is

**exactly** the wrongful conduct that Justice Ginsberg and the D.C. Circuit in Noxell held should be

remedied and deterred by an award of reasonable attorneys fees under section 1117 of the Lanham

Act.  For the foregoing reasons, Rekestad and the EFF respectfully submit that an award of costs and

fees would be appropriate. (Indeed, that a failure to award attorneys fees would be highly

inappropriate and would sent a terribly wrong and destructive message).

## CONCLUSION

For the foregoing reasons Rekestad, the EFF and counsel pray for an award of taxable costs,

for a reasonable attorneys' fee, and for reasonable nontaxable costs, as set forth in their Motion.

Respectfully submitted,

**ELECTRONIC FRONTIER
FOUNDATION and HANS
REKESTAD ENTERPRISES**,

By counsel,

March 27, 2002

Eric C. Grimm (P58990)
**CYBERBRIEF, PLC**
320 South Main Street
P.O. Box 7341
Ann Arbor, MI 48107-7341
734.332.4900

COUNSEL FOR EFF and HANS
REKESTAD ENTERPRISES.

Page 12

## CERTIFICATE OF SERVICE

I certify that the foregoing **FED. R. CIV. P. 54(d)(1) and (2) MOTION AND SUPPORTING MEMORANDUM OF HANS REKESTAD ENTERPRISES AND ELECTRONIC FRONTIER FOUNDATION FOR COSTS AND FEES** was served on the following counsel of record, by electronic mail on March 27, 2002, and by depositing them with the United States Postal Service, with First Class Mail or more expeditious means of delivery prepaid, on or before March 27, 2002:

> Gregory D. Phillips, Esq.
> Howard, Phillips & Andersen
> 560 E. 200 South, Suite 300
> Salt Lake City, UT  84102
> 801.366.7451
>
> Kathleen Lang, Esq.
> Dickinson Wright PLLC
> 500 Woodward Ave, Suite 4000
> Detroit, MI 48226-3425
> 313.223.3500

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED